## WILLIAM NORRIS *v.* SAMUEL J. HENSLEY.

CONSTRUCTION OF A WILL.—If by the terms of a will the estate is devised to "A," to have and to hold during his lifetime, and then to go to his heirs; if the word "heirs" is used in a general sense to indicate those to whom by law the property would pass by descent, and not in a special or restrictive sense to designate certain particular individuals, the whole estate vests in "A" in fee simple, notwithstanding the language of the will limits him to a life estate.

IDEM.—The following was the language of the bequest in the will: "I bequeath to Dr. Van Canaghen, one third of my property on California street, and one third to my son, and one third to my brother, each and all of them to have and to hold their lifetime, and then to go to their heirs and assigns. But never to sell." *Held,* that by the terms of the will, the three devisees named took a fee simple estate in the property devised.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

The facts are stated in the opinion of the Court.

*R. F. Morrison,* for Appellant.

The question thus arising for adjudication by this Court is, perhaps, a new one, so far as the judicial history of the State is concerned, and its novelty is fully equalled by its importance. There is no doubt that the learned counsel for the defense will invoke an arbitrary rule of construction known as the " Rule in Shelley's Case," and will urge that in England, as well as in several States of this Union, the meaning of the language used in this will has received a judicial construction adverse to the plaintiff's right to recover in this action. But however far the Courts may have gone in establishing the rule in *Shelley's Case,* we insist that where the intention of the testator is so perfectly clear as it is in the will of Elizabeth Townsend, the Courts cannot apply an arbitrary rule of law, and thereby entirely defeat the wishes and intention of the testator as they manifestly appear upon the face of the will. It has been so held in numerous cases, and we doubt not such is the principle now well settled by the authorities. (*Tanner* v. *Livingston,* 12 Wend. 92.)

The fundamental rule is that the intention of the testator is

to be collected and allowed, though not expressed in legal language. *Where the intention is clear to give only a life estate, it should govern.* (*Rogers* v. *Rogers*, 3 Wend. 509.)

The reasons upon which the rule in *Shelley's Case* is founded, never had any application to the entirely different condition of things in this country.

The laws of primogeniture and the doctrines of feudal tenures prevailing in England are unknown to us, and there is no good reason in law or logic for applying to the changed state of affairs here an old, arbitrary rule, such as that laid down in *Shelley's Case*. The foundation of the rule and the reasons why it should not be allowed to interfere with the intention of a testator in this country, are clearly set forth in the opinion of Mr. Justice Barlow. (See case of *Schoonmaker* v. *Shirley*, 3 Denio, 492.)

Again, the rule in *Shelley's Case* was laid down with reference to a common law conveyance, and although it has been extended in its application to wills, yet there is more latitude of construction allowed in case of wills in furtherance of the testator's intention. (4 Kent's Commentaries, 226.)

These authorities, and the numerous cases to which they refer, clearly show that the arbitrary rule of law laid down in *Shelley's Case*, is by no means of controlling force and effect, regardless of the clear and manifest intention of the testator, but on the contrary, where it is perfectly obvious from the language of the testator that a life estate was intended to be created, only such an estate will pass remainder in fee to others. Indeed, it is a favorite doctrine with the Courts, that in the construction of wills, the intention of the testator shall be the pole star, and the cases in which such intention is rejected constitute the exception and not the rule.

*Delos Lake*, for Respondent.

The case is directly within the rule in *Shelley's Case*, (1 Coke, 104,) which is stated by Preston thus: "When a person takes an estate of freehold, legally or equitably, under a deed, will, or other writing, and in the same instrument there

is a limitation by way of remainder, either with or without the interposition of another estate, of an interest of the same legal or equitable quality to his heirs, or heirs of his body, as a class of persons to take in succession, from generation to generation, the limitation to the heirs entitles the ancestor to the whole estate." (4 Kent's Com. 215.)

This rule has been the common law of England for near five hundred years, and is stated by Chancellor Kent to be "received and adopted in the United States as part of the system of the common law." (4 Kent's Com. 229.)

In this State the common law of England is, by statute, made the rule of decision. The case of *Tanner* v. *Livingston*, 12 Wend. 83, is plainly distinguishable from this. In that case the devise was to Le Roy and Anna Livingston for their natural lives. Then, in a separate item, and as a separate devise, the remainder is devised to the *heirs male* of Le Roy and Anna.

Under the law in *Shelley's Case*, Le Roy and Anna Livingston would have taken, under the will, an estate tail, except for a provision in the will that the heirs male should take an estate in fee simple as tenants in common. But as entails had been abolished by statute, the rule in *Shelley's Case*, of course, could not be applied, because it would create an estate forbidden by law.

There are other facts in the case distinguishing it from the present, but it is not necessary to pursue them. It is sufficient that the Court held, not that *Shelley's Case* was not law, but that the case was not within it.

The very gist of the rule is, that if by the terms of the will, or other conveyance, it is provided that the estate should pass in the line of hereditary succession, or according to the laws of descent, the ancestor will take the whole estate. And, therefore, wherever the word "heirs" is used in a general sense, and not in a special or restrictive sense, to designate certain particular individuals, the whole estate vests in the ancestor, notwithstanding the language of the conveyance limits him to a life estate. (4 Kent's Com. 226.)

56

In *Horne* v. *Lyeth*, 4 Harris & John., Maryland, 431, it was held that a devise of a term for ninety-nine years to A. during her natural life, and after her death to her heirs, vested the entire interest in the term in A.

The Court say that the word " heirs," when used alone, without explanation, is always a word of limitation, and not of purchase, and no presumed intention will control its legal operation. (*Stewart* v. *Kenower*, 7 W. & S. 288 ; *McFeely* v. *Moore*, 5 Hammond, 465 ; *King's Heirs*, 12 Ohio, 390 ; 5 Conn. 100 ; 3 Edw. Ch. 1.)

By the Court, CURREY, J.

This action was brought to recover damages in the sum of twelve thousand dollars for the breach of a covenant of seizin contained in a deed of conveyance of a parcel of land in the City of San Francisco, executed by the defendant to the plaintiff.

Elizabeth L. Townsend was the owner in fee of the land described in the deed, and made her will, devising it to Dr. Van Canaghen and to her son, John Henry Townsend, and to her brother, Moses Schallenberger. She died in December, 1850. The devise was in the following words :

" I bequeath to Dr. Van Canaghen one third of my property on California street, and one third to my son, and one third to my brother, each and all of them to have and to hold their lifetime, and then to go to their heirs and assigns. But never to sell it."

The devisees conveyed the premises to the defendant by deed purporting to grant the same in fee, and the defendant in November, 1861, conveyed the same premises to the plaintiff for the consideration of twelve thousand dollars, by deed, in which was contained a covenant of seizin. The question submitted to the Court below was, whether the devisees named took under the will only a life estate in the premises or an estate in fee simple absolute. The Court held that they took

an estate in fee simple, and gave judgment for the defendant. Whether the Court was correct or not in its construction of the devise set forth is the only question involved in the case.

The doctrine declared in *Shelley's Case*, 1 Coke R. 93, is that where an estate of freehold is limited by gift or conveyance to a person for life, and in the same gift or conveyance there is a limitation, mediate or immediate, to his heirs, or the heirs of his body, the word *heirs* is a word of limitation of the estate, and not of purchase; by which, says Mr. Preston, it must be understood that it is not a designation of persons to take originally in their own right. (1 Preston on Estates, 264.) The rule in *Shelley's Case*, as it is called, Chancellor Kent says, has been established as an axiom in the English law for near five hundred years. (4 Kent's Com. 218.) "The principle of this rule," says Mr. Jickling, "is of much greater antiquity than the name, the former being virtually recognized in the Year Book of 18, Ed. II (1325), the latter not adopted till after the determination in *Shelley's Case*, 32 Eliz. (1590), in which the subject was incidentally discussed." (Jickling on Legal and Equitable Estates, 281.) It has generally been considered as of feudal origin, and introduced to prevent frauds upon tenure (1 Fearne on Contingent Remainders, 113); but Mr. Hargrave, in his observations concerning the rule, considered it as one of the barriers provided by law to guard descent from being confounded with purchase. (Hargrave's Law Tracts, 574, 575.)

In *Perrin* v. *Blake* in the Court of Exchequer, Mr. Justice Blackstone held it by no means clear that the rule took its rise merely from feudal principles; he was rather inclined to believe it was first established to prevent the inheritance from being in abeyance, and that one principle foundation of it was to obviate the mischief of too frequently putting the inheritance in suspense or abeyance. Further he said "another foundation might be and was probably laid in a principle diametrically opposed to the genius of the feudal institutions; namely, a desire to facilitate the alienation of land and to throw it into the track of commerce one generation sooner, by

vesting the inheritance in the ancestor, than if he continued tenant for life, and the heir was declared a purchaser." That the decisions of Courts were influenced by this additional consideration suggested by Mr. Justice Blackstone, has been doubted by high authority, because in the early years of the common law it was the fruits of the tenure rather than the power of alienation, that engaged the attention of the Courts. (1 Preston on Est. 307.) But in modern times the principle suggested has gained ground, and it may be said the tendency of modern decisions has been to discourage and discountenance every contrivance having the effect to operate in restraint of the free alienation of property, or to divert it from the regular course of descent. What may have been the origin of the rule, it is not particularly important to inquire for the determination of the question before us. It is enough that we are satisfied that it has been a settled rule of property in all countries where the common law has been and is in force as the law of the land; and being thus satisfied, our duty is to ascertain if the case in hand comes within or falls without the rule, and to decide accordingly.

In the application of this rule to deeds of conveyance, it has been generally held of more absolute control than when applied to wills. (4 Kent Com. 216; 1 Preston on Estates, 271; 2 Fonb. Eq. 70.) It is certain, says Mr. Butler (Coke Litt. Sec. 719, note 1), that no rule of law has a more ancient origin, or is more generally established, than that if a testator expresses his intention defectively, either by not using technical and artificial terms, or by using them improperly, yet if his intention can be collected from his will, the law, however defective his language may be, will construe his words according to his intentions; and if the object of it is warranted by the established rules of law and equity, will admit of its full operation and effect. It is equally certain, on the other hand, that if the testator's intention appears to be to effect that which the rules of law and equity do not admit, neither the Courts of law nor the Courts of equity can allow its operation. The first thing, therefore, to be ascertained is, what the

object of the testator is; the next, whether it is such as the rules of law and equity admit. In *Perrin* v. *Blake*, 4 Burr, 2,579, Lord Mansfield said, the rule is not a general proposition subject to no control, where the intention is on the other side, and where the objections may be answered. And he agreed with Justices Wilmot and Aston, that the intention is to govern, and that *Shelley's Case* does not constitute a decisive uncontrollable rule. Mr. Preston says the most strenuous advocates for a proper and legal application of the rule must admit, that the intention is to be collected, and if clearly expressed, to be observed. After the intention is fixed, the law decides on the gift; allowing the intention to govern as often as it is clear that the word *heirs* is not used as descriptive of the class of legal successors, but in designation of an individual or of particular persons. The intention to be observed in exclusion of the rule must be expressed in terms manifestly exhibiting to the mind clear evidence that the heirs are not to take merely in that right, and as answering that description. The inquiry must be directed to discover the intention, and to see whether the gift is clear of the reasons on which the rule depends for effect; for as Lord Hale very pertinently observed, in *King* v. *Melling*, in reference to wills, the intention is to be law to expound the testament. "The true ground of decision is the intent, and the true question is, what is the intent? and the interpretation is to show the intent." (1 Preston on Estates, 275.)

The intention, it is to be remembered, is to be sought for not only by consulting the words of the will, but also by the rules of interpretation, which have been from time to time adopted by Courts of law for its ascertainment. (1 Sum. 239.) In *Hodgson* v. *Ambrose*, 1 Doug. 337, Mr. Justice Buller observed, in a case involving the construction of a will: "There is no rule better established than that the intention of a testator, expressed in his will, if consistent with the rules of law, shall prevail." Mr. Preston, in commenting upon the words "if consistent with the rules of law," says these words are applicable only to the nature and operation of the estate

or interest devised, and not to the construction of the words. The question whether the intent be consistent with the rules of law or not, can never arise until it is settled what that intention was. This can only be discovered by taking the whole together. (1 Preston on Estates, 276.) It is not sufficient that the intention should depend on inference or presumable reasons; it must be manifested by words which are explicit; by words which, without any infringement of the rule in *Shelley's Case*—at least the reason and spirit of that rule, if not its literal terms—may be construed to be a designation of particular persons. (1 Preston on Estates, 279.) At common law, a devise of an estate to heirs which they would have taken by descent, was void, and the heirs took as heirs and not as purchasers. (2 Wash. on Real Property, 136, 268.)

In *Jones* v. *Morgan*, 1 Brown's Ch. Cases, 219, Lord Chancellor Thurlow described the outlines of distinction applicable to all the cases in which the rule in *Shelley's Case* had been subjected to judicial and forensic scrutiny. He drew an inference from all the cases, that where the estate is so given, that after the limitation to the first taker, it is to go to every person who can claim as heirs to the first taker, the word *heirs* must be a word of limitation—that all heirs taking *as heirs* must take by descent. His lordship said he thought the argument immaterial that the testator meant the first estate to be an estate for life. He took it, that in all cases the testator did mean so. He rested it on what the testator meant afterwards; if he meant that every other person who should be heir should take, he then meant what the law would not suffer him to give, or the heir to take as a purchaser; and further he said, all possible heirs must take as heirs, and not as purchasers; that in all cases where the limitation of an estate of freehold to a man and afterward to the heirs of his body, whether general or special, so as to give it to the heirs as a denomination or class, the heirs shall be in by descent and not by purchase.

Mr. Fearne, after having given to the subject a thorough

and masterly examination, in which he noticed especially the
decision of Lord Thurlow in *Jones* against *Morgan*, denomi-
nating it "very high authority," said : "Now, if the inference
I have drawn from the very operative tendency of the law to
hereditary descent, in its mode of approaching it, where the
requisite ground for its accomplishment is wanting, be just ;
if from such premises, unopposed by any single repugnant
decision or judicial opinion, the conclusion that the capacity
of an heir to take the inheritance by purchase, so as to trans-
mit it through the same line as by descent, is confined to those
cases only where the ancestor takes no estate of freehold, be
sufficiently founded, Lord Thurlow's doctrine embraces the
subject to the full extent of his expression. For then, when-
ever the ancestor takes the freehold the inheritance will not
go to all the heirs, etc., in the course of inheritable succession,
unless by an actual descent ; and consequently, if after the
first taker it is to go to every person who can claim as heir to
him, the intended succession can only be effectuated by taking
the word *heirs*, etc., as words of limitation. If after him all
heirs, etc., are to take as such—that is, as answering that de-
scription, they can take only by descent. If the law will
not admit of all possible heirs, etc., taking the inheritance
after its inception by a freehold in the ancestor otherwise than
by descent, it follows that wherever the limitation to the heirs,
etc., after a freehold to the ancestor is admitted to reach the
whole denomination or class of heirs described, they must take
by descent and not by purchase." (1 Fearne's Cont. Rem.
308.)

The principle upon which the rule in *Shelley's Case* is
founded being understood, it is next necessary to ascertain if
the devise under consideration comes within the rule. The
devise was to the three persons named in the will, with the
*habendum* "each and all of them to have and to hold their
lifetime, and then to go to their heirs and assigns," with the
superadded words "but never to sell it." The words "their
heirs" do not designate particular persons, but is a *nomen col-
lectivum*, comprehending the whole succession of heirs, lineal

and collateral, of the three devisees. Here there is not even a limitation to the heirs of the body of each of the devisees, and if it were possible to construe the words " their heirs " as meaning the heirs of their bodies, even then they could not be held a *designatio personarum* without superadded words of enumeration showing clearly and unequivocally that the testatrix intended they should take in remainder an estate in fee in the premises in the character of purchasers and not in the character of heirs of her immediate devisees, and that they should constitute the root of a new inheritance—the stock of a new descent. In the cases wherein it has been held that a devise to one for his life with remainder to the heirs of his body, did not fall within the rule in *Shelley's Case*, there were superadded words of unquestionable intent controlling the direction of the property devised. For example, where the devise was to A., and the issue of her body lawfully to be begotten, as tenants in common, if more than one, but in default of such issue, etc., devise over, it was held that A. took a life estate only, and the limitation to her children was a contingent remainder to them in fee as purchasers. (*Davy* v. *Burnsall*, 6 Term R., 30.) There are many cases to be found in the books proceeding upon the principle that where there are superadded words clearly and unequivocally expressing the intention of the testator to invest the first taker or immediate devisee with an estate for life only, with remainder in fee to the children or issue, or heirs of the body of the tenant for life, the intention shall be carried into effect, provided it be not inconsistent with the rules of law so to do.

In *Doe* v. *Jesson*, 5 Maule and Selwyn, 95, the devise was to W. for life, and after his decease to the heirs of his body lawfully issuing, in such proportions as he should appoint, and for want of such appointment then to the heirs of his body lawfully issuing, share and share alike as tenants in common, and if but one child the whole to such only child, and for want of such issue, then to the testator's right heirs forever. The testator died and W. entered, and afterwards married and had issue. It was held by the Court of King's Bench that W.

took only an estate for life, and that his children also took only an estate for life; but on writ of error to the House of Lords, where Lord Eldon and Lord Redesdale both delivered opinions, the judgment of the King's Bench was reversed. Lord Eldon placed his judgment on the ground in part at least, that the words of devise to W., for and during his natural life, followed by the words of the devise to the heirs of the body of the said W. lawfully issuing, constituted W. tenant in tail of the freehold, notwithstanding the testator had before given an estate expressly to W. for his natural life only; and his lordship said "in order to cut down this estate tail, it is absolutely necessary that a particular intent should be found to control and alter it, as clear as the general intent here expressed," and he then proceeds, "the words 'heirs of the body' will indeed yield to a clear particular intent, that the estate should be only for life, and that may be from the effect of superadded words, or any expressions showing the particular intent of the testator; but that must be clearly intelligible and unequivocal"—and further on he says, "the heirs of the body" comprehend all the posterity of the donee in succession. The conclusion to which he came was that no such intent was clearly and unequivocally shown in the superadded words, but on the contrary that the words "for want of such issue" showed that the issue were to take in succession as heirs of the body and not as a mere description of persons. Lord Redesdale in the same case said, "It is dangerous, where words have a fixed legal effect, to suffer them to be controlled without some clear expression or necessary implication;" and the result of his opinion was that by "heirs of the body" the testator did not mean children alone. In conclusion he said, "if the testator had considered the effect of the words he used, and the rule of law operating upon them, he would have used none of the words in the will." (*Jesson* v. *Wright*, 2 Bligh. 50, 59.)

The words of the will under consideration do not manifest a clear and unequivocal intention on the part of the testatrix to give to the devisees named therein merely a life estate in the

premises; nor does it appear that the words "their heirs" were intended as a designation of particular persons who should take an estate in the lands mentioned otherwise than by descent as heirs of their respective ancestors—the first takers under the will. If the words "each and all of them to have and to hold their lifetime and then to go to their heirs and assigns," could be interpreted as a clear and unequivocal expression of the intention of the testatrix to create in the first takers under her will a mere life estate in the premises, and a remainder in fee to their heirs, whoever they might be when the life estate should expire, then before such intention could be carried into effect, it would be necessary to determine the words, "their heirs," to be a *descriptio personarum.* But to do so would be in violation, as we have seen, of settled principles of law, as well as in disregard of the definition of the term "heirs" in its general and accurate legal sense. That the testatrix intended the estate devised to go to the devisees, whom she named as the immediate recipients of her bounty, in fee, seems to us more than probable from the entire language which she employed as an expression of her will. She did not stop with the word "heirs," but added the words "and assigns." We are not at liberty to disregard these added words while seeking for the testatrix's intent. The devise to the persons designated, to have and to hold their lifetime, and then to go to their heirs and assigns, is in substance the same as if the words "to go" had been omitted, because in either case, the estate could not go to the heirs of the immediate donees until there could be heirs to them, to take. No person can become an heir to his ancestor while his ancestor lives. *Nemo est hæres viventis.*

If it is to be presumed the testatrix had in mind any particular object in the use of the word "heirs," it is legitimate to suppose she meant it should have its settled legal effect, as associated with the essential words of devise which she used, which was to transmit to her devisees an estate in fee in the premises. To pass an estate of inheritance or an estate in fee simple absolute to the devisees named, it was necessary to use

the word "heirs" or its equivalent; for if at the time of her death land was given to a man forever or to him and his assigns forever, without the use of the word "heirs" it vested in him only a life estate (2 Black. Com. 107,) and because this was then the law of the land a reason is apparent for the use of the term "heirs" in the devise.

On the part of the appellant some reliance is placed on the *habendum* "to have and to hold their lifetime," as evidence of the design of the testatrix to invest them with a life estate merely. This, to one ignorant of the law, might produce the impression at least that she so intended. But if she herself had any idea of the force and effect of the language of the devise as a whole, she must have known that the devisees named would take the estate in fee as soon as she should cease to live, and that the words "but never to sell it," coupled with the previous words, would not avoid such consequence. It is not improbable that she desired her devisees to retain the property she was providing to give them, so long as they might live, but that she wished to invest them with a life estate only is not supported by the words of the will, nor is there any evidence which is sufficient to satisfy the law that she intended to create an estate in remainder contingent upon the existence of heirs of her immediate devisees when death might put an end to their tenure.

Judgment affirmed.