# OYER AND TERMINER OF LACKAWANNA.

## THE COMMONWEALTH vs. WILLIAM SCOTT.

### CHARGE OF THE COURT BY HANDLEY, P. J.

1.   To constitute murder of the first degree, under the Pennsylvania Statute providing for the punishment of that crime, the killing must be without justification, malicious, wilful, deliberate, premeditated and with a specific intent to take life.   If the killing does not contain these ingredients it is murder of the second degree.

2.   No man is bound to stand still and allow himself to be murdered or seriously injured, but no man can justify the taking of the life of another where he deliberately retires from the scene of merely loud words accompanied with threats to do harm, arms himself with a deadly weapon and returns to the scene of the former strife for the purpose of inciting on the rage of another to combat.   Killing under such circumstances is either murder of the first or second degree.

3.   While the constitution allows every citizen to bear arms, the constitution and laws do not allow a man to carry arms for the express purpose of committing murder.

4.   Where a person in peril acts purely upon the defensive, it is not necessary under the law that he should be in imminent peril of life or great bodily harm before he may slay his assailant.   If in good faith the prisoner had reasonable belief, founded upon the facts as they appeared to him at the time, although it should afterward appear he was mistaken, the law will not hold him to absolute correctness of judgment under such trying circumstances.

*Gentlemen of the Jury*:—But a few short moments more, and the responsibilities of the result of this case will be upon your shoulders.   We have no fears but that you fully comprehend the awful and terrible responsibility you have assumed in this case.   That you will do justice between God and man while disposing of this case, no one that knows your antecedents need have any apprehension, not even the prisoner at the bar.   You will bear in mind while disposing of a case of this magnitude, where, by simply saying the little word "yes" or "no," and life or death is the result of these words, that life is too short and eternity too long, for either this Court, or the Jury, to do any wrong to this prisoner.   The Commonwealth, for the first time in the history of this young county, presses for the conviction of this prisoner.   She is not entitled to one drop of his life's blood, unless she has made out a case beyond a reasonable doubt and has established in your minds a conviction that this prisoner has forfeited his life, according to the laws of the land.   If she fails in any one particular in establishing the crime of murder of the first degree, then the silver

thread of life ought not to be destroyed, and the prisoner should be allowed to go free of that crime.

The evidence shows that James Gallagher is dead; and for that death the Commonwealth has presented her indictment charging the prisoner, first, with murder and second with manslaughter. That your minds may not become confused, I will read to you the law providing for the punishment of these crimes. The law reads thus: "All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempt to perpetrate any arson, rape, robbery or burglary, shall be deemed murder of the first degree; and all other kinds of murder shall be deemed murder of the second degree." Now it has been the practice of Judges in Pennsylvania, when the law was thus far read, to read no more of this law to a jury; but the time has passed to keep from the jury the knowledge of what may follow their findings, and hence I deem it proper to read to you further upon this point: "And the Jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, ascertain in their verdict whether it be murder of the first or second degree." * * * "Every person convicted of the crime of murder of the first degree, his aiders, abettors and counsellors, shall be sentenced to suffer death, by hanging by the neck." * * * "Every person duly convicted of the crime of murder of the second degree, shall, for the first offence, be sentenced to undergo an imprisonment, by separate or solitary confinement, not exceeding twelve years." * * * "Every person convicted of voluntary manslaughter, shall be sentenced to pay a fine, not exceeding one thousand dollars, and to undergo an imprisonment, by separate or solitary confinement at labor, or simple imprisonment, not exceeding twelve years." Now you will have noticed as I read the statute providing for the punishment of the crime of murder, that the law making power, considering that there is a manifest difference in the degree of guilt, where

a deliberate intention to kill exists,and where none appears, distinguishes murder into two degrees. Hence, he who takes the life of another, with a deadly weapon and with a manifest design thus to use it upon him, with sufficient time to deliberate and form a conscious purpose of killing, and without any sufficient reason, or cause of extenuation is guilty of murder of the first degree, as we now understand the law in this State. When the act is done deliberately, with a deadly weapon, and is likely to be attended with dangerous consequences, the malice requisite to murder, will be presumed by the Jury; for the law infers that the natural and probable effect of any act deliberately done, is intended by the actor. Where the killing then, is malicious, and the evidence shows a wilful, deliberate and premeditated purpose to take life, it is murder of the first degree. All murder not of the first degree, is necessarily murder of the second degree, and includes all unlawful killing under circumstances indicating depravity of heart, and a disposition of mind regardless of social duty where no intention to kill exists or can necessarily be inferred. Therefore, in all cases of murder, if no intention to kill can be inferred, or collected from all the circumstances in the case, the verdict under such circumstances must be murder of the second degree. Manslaughter is the unlawful killing of another without malice express or implied. Malice is the distinction between murder and manslaughter. Such killing may be voluntarily done in a sudden heat of passion, or involuntary in the commission of an unlawful act. Voluntary manslaughter often so nearly approaches murder that it is necessary to distinguish clearly the difference of heart, that condition or frame of mind before spoken of, exhibiting wickedness of disposition, recklessness of consequence, or cruelty. But being sometimes a wilful act, as the term voluntarily denotes, it is necessary that the circumstances should take away every evidence of cool depravity of heart or wanton cruelty. Therefore to reduce an intended blow, stroke or wounding, resulting in death, to voluntary manslaughter, there must be cause of provo-

cation, and a state of rage or passion, without time to cool, placing the accused beyond the control of his reason and suddenly impelling him to the commission of the deed. If any of these things be wanting, if there be provocation without passion, or passion without legal provocation, or if there be time to cool, and reason has assumed its former sway, the killing then will be murder. But it is not every cause of provocation that is regarded as sufficient or legal. Insulting or scandalous language, or words, are not a sufficient cause of provocation, nor are actual indignities to the person, of a slight and trivial nature. Whenever, however, the act evidences a deadly revenge, and not the mere heat of blood; whenever it is the result of a bad disposition, and not merely the frenzy of rage, it is not manslaughter but murder. Passion arising from adequate legal provocation is evidence of the absence of malice. Now the law, as thus stated, applies to this case. What, then, is the evidence? To ascertain and arrive at a correct verdict in this case it is not for you to take up the evidence and say, is the prisoner guilty or not guilty ? That will not do in a case of this magnitude. It becomes your duty to take up all the evidence produced for and against the prisoner and apply it to the question, whether the prisoner is guilty of murder of the first degree. If after you have examined all of the testimony, giving every part full consideration and weight, and reconciling that which is conflicting, bearing in mind the remarks that the prisoner made after he shot Gallagher, you then fail to ascertain that it was Scott's intention to kill Gallagher, and that Scott shot with no specific intent to take life, then you ought not to convict of murder of the first degree. But if after you have examined Lawrence Sullivan's testimony, and also the testimony of John McHale and the testimony of the two witnesses who spoke to Scott after he was arrested, together with all the other testimony in the case, and your consciences tell you that Scott is guilty of murder of the first degree, then you are in duty bound, no matter what may be the consequences to the prisoner, to return a verdict of

murder of the first degree.   If, as I said before, there is a reasonable doubt in your minds, or your consciences will not allow you to return a verdict of murder of the first degree, under the evidence and the law as we have laid it down, then you may apply the evidence and ask the question, Is the prisoner guilty of murder of the second degree? Now if it is true that Scott was crossing that bridge on the 19th of April last, and he met Gallagher and Sullivan standing thereon, and these men had some loud words together, what they were the evidence fails to show, save only as Sullivan repeats it in part, and Scott retired and went back to the store, and obtained this pistol for no other purpose but to protect his person on that day, and again resumed his position upon that bridge, and while there an altercation came up between these parties, and Scott, then and there shot Gallagher without a specific intent to take life, you may convict the prisoner of murder of the second degree.   Well, if you cannot find a verdict of murder of the second degree, then it is for you to take up the evidence and say, Is Scott guilty of manslaughter as charged in the second count of the indictment?   If you believe the evidence in this case, and set aside the theory set up on the part of the defense, that the pistol went off by accident, and when that defense was driven to the wall, partially or wholly, as you may find from the evidence, and the defense then fell back upon the law of self-defense and admitted the shooting, then it is for you to say whether there was an unlawful killing, without malice, express or implied, on that bridge, and you find there was, such as the testimony presented on the part of the prisoner discloses, then you may return a verdict of guilty as charged in the second count, but not guilty as charged in the first count.

If you cannot agree that the prisoner is guilty, either of murder of the first or second degree or of manslaughter, then take up the evidence in this case, and apply it to the theory of the defense and say whether the prisoner has established a killing in self-defense.   If you so find, you are

in duty bound to return a verdict of not guilty as charged in the indictment. Now, much might be said concerning the conflicting points in the testimony, but that is wholly for you. Hence I will not detain you now, after having devoted so much time as we have in this case, to recall these conflicting points, and point out how you may reconcile them. It is sufficient to say that it is your duty to recall all the conflicting points in the case, reconciling them the best you can and then say whether the prisoner is guilty of murder of the first degree or of murder of the second degree, or of manslaughter, or not guilty. The prisoner, through his counsel, has presented several legal points which he desires read to you. The law requires that we read and answer each point as read. The law further requires that the Judge shall reduce his answers to writing, so that if any error should be made by which the prisoner might suffer, the Supreme Court will restore the prisoner his rights. I will now read the first point to you :

*First.* "When an act is done it is lawful, excusable or criminal, according to the character of the intention, which dictates and commands its doing. The character of the intention not only determines an act to be lawful or criminal, but it also measures and fixes the degree of crime.

Therefore, it is the duty of the jury in this case to say that the act of shooting was excusable or criminal according as they find the intention of the prisoner to be lawful or criminal at the time he fired the shot."

*The Court*—This point we affirm.

*Second.* "If the jury should find the intention of the prisoner at the time he fired the shot to be of such a character as would determine the act of shooting to be a criminal act, then it is their duty to fix the degree of crime, that is to say, whether is is manslaughter or murder in the second or first degree, according to the character of the intention of the prisoner at the time he fired the shot."

*The Court*—We affirm this point.

*Third.* "The character of the intention of the prisoner at

the time he fired the fatal shot, being hidden and closed from human sight it must be determined by the jury by natural presumptions reasonably drawn from the whole evidence; therefore if the jury can find any reasonable theory or hypothesis that would lead to a lawful or excusable intent, on the part of the prisoner at the time he fired the shot, it is their bounden duty to adopt such theory however many other theories there are which would lead with equal or greater force to a criminal intent."

*The Court*—This point we affirm.

*Fourth.* "If the jury believe that Gallagher and Sullivan or Gallagher alone followed the prisoner from the bridge to the store, threatening to inflict upon him bodily injury, and that Gallagher was known to be a powerful, desperate and vicious character, that against such a man the prisoner had the constitutional right to carry arms for his protection."

*The Court*—If you find from the evidence that when Scott, the prisoner, Gallagher, now dead, and Sullivan met on the bridge named in the evidence and that Scott then learned it was the intention of Gallagher or Sullivan or both together to attack him, and before any blows were inflicted, Scott returned to the store named in the evidence, then it became his duty to make complaint to the proper officer and have Gallagher and Sullivan or Gallagher alone bound over to keep the peace. No man can be allowed to arm himself and then throw himself in the way of a powerful, desperate and vicious man for the purpose of using such arms. Hence we say to you that while the Constitution allows every citizen to bear arms, the Constitution and laws do not allow a man to carry arms for the express purpose of committing murder. With this qualification, we affirm this point.

*Fifth.* "The expression of the law that a person must be driven to the wall before he is excusable in taking the life of his assailant means no more than that a person must be in a position that farther retreat would increase the danger.

When the attack upon a person is so fierce and violent that a retreat would not diminish but increase the danger, such person may instantly kill his adversary without retreating at all, and such killing would be excusable homicide. Therefore if the Jury believe that the prisoner saw Gallagher and Sullivan awaiting his return to the bridge and that the prisoner knew the power and the vicious and desperate character of Gallagher and Sullivan, and if they further believe that the prisoner in view of these facts armed and exposed his arms with an intention of warding off their attack upon him as he crossed the bridge, and while crossing the bridge Gallagher made a fierce and violent attack upon him, in full view of the deadly weapon which he held in his hands and against the repeated warning to "stand back," the prisoner was excusable in shooting before Gallagher got within striking distance of him, although such shooting resulted in the death of Gallagher, and the prisoner ought to be acquitted."

*The Court*—This point we affirm in part, and deny in part. The rule of law is where a person in peril acts purely on the defensive, that it is not necessary he should be in imminent peril of life or great bodily harm before he may slay his assailant. It is sufficient if in good faith he had reasonable belief, and founded upon the facts as they appeared to him at the time that he is in such imminent peril. If, though it should afterwards appear that he was mistaken the law will not hold a man to absolute correctness of judgment under such trying circumstances. So far, therefore, as this rule applies to the right of a person when attacked to slay his assailant we affirm. That portion of this point which allows a person to arm himself and expose such arms after he had knowledge that Gallagher was lying-in-wait for his coming, we cannot affirm. The moment Scott discovered that Gallagher intended to attack him and Scott then returned to the store in safety it became Scott's duty at that time to have had Gallagher arrested by making proper complaint to an officer of the law

and not to arm himself and return to the very place where he was to be assailed.

*Sixth.* "If a man is attacked by a person of strength superior to his own, he is not bound to flee, but may use such weapons and such force to repel his assailant. If the assailant is killed it is excusable homicide."

*The Court*—"This point, as a naked legal proposition, we affirm. Of course it is your duty to find the facts in the evidence to sustain this point. If there are no facts to sustain this point, in the evidence, then this affirmation ought not to control your verdict.

*Seventh.* "If the Jury believe that the attack of Gallagher upon the defendant was so sudden, fierce and violent that a retreat would not diminish but increase his danger he may instantly kill his adversary without retreating at all and such killing would be excusable homicide."

*The Court*—This point, as we have said in our answer to the preceding point, we affirm. If, however, the evidence in this case shows the fact and you so find it, that Scott deliberately armed himself for the purpose of shooting Gallagher then we cannot affirm this point.

*Eighth.* "When from the nature of the attack there is reasonable ground to believe that there is a design to destroy life or to commit great bodily injury, the killing will be excusable homicide, although it should afterwards appear that no such injury was intended. And, therefore, if the jury believe that the prisoner knew the power and vicious character of Gallagher and Sullivan, or of Gallagher alone, that Gallagher and Sullivan followed him from the bridge to the store threatening to do him bodily injury, that they afterwards went back to the bridge to attack the prisoner on his return and that in full view of the weapon which the prisoner carried in his hand, and if in the face of repeated warnings to "stand back" Gallagher did make a fierce and violent assault upon the prisoner, these facts are sufficient to prove a reasonable belief on the part of the prisoner that Gallagher designed to take his

lite or commit upon his person great bodily injury, such killing was excusable homicide although the jury should not find that Gallagher designed no such injury."

*The Court*—This point we affirm in part and deny in part, and refer you to our answer of the prisoner's fifth point.

*Ninth.* "That if the jury believe that after the prisoner fired a single shot, he voluntarily went and gave himself up to an officer of the law, this fact would go very far in the support of the theory of the defense, namely that the prisoner fired the shot in self-defense."

*The Court*—In connection with this point you will recall to your minds the evidence of two witnesses, Henry Beck and Henry Mance. The first testified that when he spoke to Scott, he said he shot Gallagher and didn't care about it. The second testifies that Scott said he shot Gallagher and did not care a damn. These answers may or may not indicate Scott's intentions at that time. With this qualification we may affirm this point, provided you also find from the evidence that he did go and give himself up.

Now, gentlemen of the jury, it is for you to take up this case and examine all of the evidence, and apply the law as I have here laid it down, and a true verdict render. There are three questions in this case, namely: Is the prisoner guilty of murder of the first degree? If he is not guilty of murder of the first degree, then is he guilty of murder of the second degree? If he is not guilty of either murder of the first or second degree, then is he guilty of manslaughter? If the prisoner is not guilty of murder of the first or second degree, nor of manslaughter, then is he not guilty? Now it is for you to say what shall be your verdict; the fate of the prisoner is in your hands. You may retire.

*Verdict*—Manslaughter, and not guilty of murder as charged in the indictment.

*Sentence*:—$1,000 fine; ten years in the Penitentiary at hard labor.

F. W. Gunster, Dist. Atty. for Commonwealth; Messrs. Ward, Horn, Smith and Connolly for the prisoner.

THE important question of tenancy by entirety, as be-
tween husband and wife, under the married woman's
enabling acts has been much considered and variously held
in this country.  In the case of Meeker vs. Wright, Dan-
forth, J., holds that the married woman's act of 1860, in
giving to her the sole and separate ownership of her prop-
erty, free from the control or interference of her husband,
and free from his debts, abolishes the tenancy by entirety;
so that in case of a grant to husband and wife, they take
as tenants in common, and the survivor does not take the
whole estate.  He says:  "The common law gives to the
co-grantee all the rents, issues and proceeds of the entire
property, permits him to mortgage or even sell to the entire
exclusion of the other grantee, during her lifetime, and
permits the same to be taken by his creditors to pay his
debts, simply because this other grantee or co-tenant is a
married woman and his wife, but the statute says all this
shall, notwithstanding her marriage, be and remain the
sole and separate property of the married woman, and shall
not be subject to the disposal of her husband or liable for
his debts.  The case is within the letter of the statute and
within its spirit; it is not excepted from its provisions.
The statute and the rule of the common law cannot stand
together, and the latter must give way.  It never stood
upon truth or reason, but on a fiction.  It ignored the civil
existence of the wife and merged it with all her rights in
that of her husband, and can be sustained, if at all, by an
idle and unprofitable refinement.  Under the statutes the
interests of the husband and wife in property are no longer
identical, but separate and independent."  The opinion dis-
cusses the New York cases on the subject, and comes to a
different conclusion from them.  In the opinion Rapallo
and Miller, JJ., concurred, but the rest of the court, with-
out passing on this question, agreed to reverse on another
and independent ground.  The New York Supreme Court
cases holding the other way are Goelet vs. Gori, 31 Barb.,
314; and Miller vs. Miller, 9 Abb., (N. S.), 448, at special
term, and Farmers' Bank vs. Gregory, 49 Barb., 155; Free-

man vs. Barber, 3 T. & C., 575, and Beach vs. Hollister, 3
Hun., 519, at General Term. To the same effect are several
cases in other States, not noticed in the principal case,
namely, Fisher vs. Provin, 25 Mich., 350: Diver vs. Diver,
56 Penn. St., 106; McDuff vs. Beauchamp, 50 Miss., 531;
Robinson vs. Eagle, 29 Ark., 202; Bennet vs. Child, 19
Wis., 365; Garner vs. Jones, 52 Mo., 68; Hemingway vs.
Scales, 42 Miss., 1; S. C., 2 Am. Rep., 586; Hulett vs. In-
low, 57 Ind., 412; S. C., 36 Am. Rep., 64. To the con-
trary, and in harmony with the principal case, are Hoff-
man vs. Stigers, 28 Iowa, 302; Cooper vs. Cooper, 76 Ill.,
57; Clark vs. Clark; 56 N. H., 105. The subject is re-
viewed in a note to Hulett vs. Inlow, 26 Am. Rep., 65, and
although the principal case is significant, yet it does not
change the situation from what is described by Mr. Thomp-
son in that note, when he says: "It is apparent, therefore,
that the question, especially without any conclusive deci-
sion in New York, or any in Massachusetts, cannot be con-
sidered as very firmly settled."

---

In the case of Gridley vs. The City of Bloomington, the
Supreme Court of Illinois hold that there is no obligation
upon an owner of property to keep the sidewalk adjoining
and in front thereof free from obstruction, and an ordinance
of the City of Bloomington, requiring owners of property
under penalty of fine to remove snow from their sidewalk,
was held invalid. The court say that the sidewalk, is as
much a public highway, free to the use of all, as the street
itself, and upon principle it follows the citizen cannot be
laid under obligations under the laws to keep it free from
obstructions in front of his property at his own expense,
any more than the street itself, either by the exercise of
the police power or by fines and penalties imposed by or-
dinance, or by direct legislative action.

---

In Fulwood vs. Fulwood (38 Law Times, N. S., 381),
the objection to an injunction against an infringement of

trademark was the plaintiff's delay. The court held that, assuming that the plaintiff had delayed nearly two years or more to bring his action, this would not preclude his application for an injunction. "It is to be borne in mind," said Fry, J., "that the right asserted by plaintiff in this action is a legal right; he is, in fact, asserting that defendants are liable to an action for deceit. The injunction is merely in aid of asserting the legal right of the plaintiff. In cases of such injunctions, which are merely in aid of legal rights, in my opinion the injunction is a matter of course, if the legal right exists." Otherwise, of course, if acquiescence or acknowledgement, etc., were shown.

- - - - - - - - - - -

### RULE IN SHELLEY'S CASE.

*Quia timet.* The plaintiff brings this action to quiet her title to certain real estate, of which she claims one-half in fee simple under the will of her father, and the other half in fee simple under a deed from her mother. The property was devised, and by the deed was conveyed to trustees for the benefit of plaintiff. The will was dated February 6, 1860; the deed, May 14, 1863. The will reads: "I do hereby give, devise, and bequeath, etc., to my executors and their survivors in trust for the sole and separate use, benefit, and behoof of my daughter Ramona (wife of Frederick Hilliard), for and during her natural life only, and on her decease, to the sole use, benefit, and behoof of the heirs of her own body, living at the time of her decease, to whom the said executor shall convey in fee simple, etc., and on the failure of such heirs, then on her decease to the use and benefit of John Wilson," etc. The *habendum* of the deed was in the same language. The court below found that the plaintiff took an estate in fee simple, absolute for half the property by the will, and a like estate under the deed. The defendant appealed.

Per Curiam. Upon the authority of Norris vs. Hensley, 27 Cal., 439, the judgment is affirmed. [Hilliard vs. Pacheco. Sup. Ct. of Cal. Sept., 1878.]

*NOTES OF RECENT DECISIONS IN SUPREME
COURT OF PENNSYLVANIA.*

———

In the absence of fraud the maker of an accommodation
note cannot set up want of consideration as a defence
against a holder, with notice to whom it has been pledged
as collateral security for an antecedent debt by the payee,
for whose accommodation it was made.

Appleton vs. Donaldson, 3 B. 381, and Lord vs. The
Ocean Bank, 8 II. 384, followed. Royer vs. The Bank, 2
Nor. 249, distinguished.—*Twining vs. Hunt.*

———

The Act of April 11, 1862 (P. L. 623), prescribing that
school teachers can be selected only by a vote of the school
board is to be strictly followed, and a contract made by
the President and Secretary of the Board cannot be
enforced.

PER GORDON, J., "No contract for the employment of
teachers should extend beyond the current school year."—
*School District Denison Township vs. Padden.*

———

In an action for use and occupation, a contract express
or implied must be proved.

A. occupied the dock adjoining B.'s wharf on the river
Delaware with lighters unloading a ship at the next
wharf, so that no vessel could use B.'s wharf without the
removal of the lighters. A. refused to pay dockage to B.
There was no evidence that any vessel had been prevented
from coming to B.'s wharf on account of this occupation.
In an action for assumpsit for use and occupation brought
by B.

*Held,* that judgment of nonsuit was properly entered.—
*Easby vs. Patterson.*

## SUNDAY LAWS; WHAT THEY MEAN.

### BY A MEMBER OF THE BAR.

Sunday laws have had to bear some criticism and objection which they do not deserve, founded on the idea that they are designed to compel people to be religious. This is an error. There is, indeed, some traditional ground for it. Some person who seems to have examined the law books extensively, says that every State in the Union except Louisiana has a Sunday law. The original and model of most of them is an English statute passed in 1676, while Charles II. was King. The language of that old law and the histories of its time indicate an idea that government might superintend the religious duties of individuals; that persons might be ordered by law to attend worship and maintain exercises and studies of piety at home. The title of the law, was "an act for the better observance of the Lord's day;" and it commanded in so many words the people's "repairing to church" and "exercising themselves in the duties of piety and true religion, publicly and privately." And it is probably true that when the Colonies and the early States came to re-enact this law or to pass others like it, they did so in the view that the government might compel people to be Christians, or at least behave as such. That view harmonized well with what has been called the paternal theory of government. But it does not harmonize with the doctrine of popular government as developed in late years in this country; and (so far as Sunday laws are concerned) it is abandoned, unequivocally and completely.

There are, in the administration of civil law, many cordial recognitions of Christianity, as being in fact the prevailing religion, and some adoption of religious forms and observances as congenial and germane to legal proceedings, but any purpose of compelling or even inducing persons to observe Sunday as a day of pious obligation and observance is, at the present day, entirely disavowed. The general belief that God desires or approves Sabbath observance is tak-

en into view as a fact rendering legal protections of the day proper, but it is not a doctrine of the law. Sunday is named for the rest-day because the masses of the people have for centuries observed it, more or less fully, and the government can more easily secure and protect a day already popularly designated than establish a new one; not because they undertake to enforce a divine command. *Vox populi*, not *Vox Dei*, is the basis of the statute. Its purpose is to guarantee, impartially, that the masses shall enjoy a stated day during which there shall not be needless demands of ordinary business, or attractions and temptations of exciting amusements, or interruption of noise and tumult, preventing or hindering those from worshipping who wish to worship, those from meditating or studying who wish to do so, those from resting who need repose. In every community there are some persons who desire these things. The Sunday law seeks to give a moderate opportunity to enjoy them.

Consider how varied the preferences are! Some would pursue trade and amass wealth unremittingly. Some would luxuriate in a constant round of shows, refreshment-saloons, processions, excursions, fourth of July fireworks, theatrical entertainments, avenue trots, sea bathing or skating, hunting or fishing; would never grow weary (they think) of pleasure. Some would devote all their days to books and learning. Some wish to withdraw to religious retreats for lives of meditation and prayer. There are the sick and the aged, to whom the activities of the young and well seem always an irksome turmoil. There are a hundred intermediate types. Above all, there are those who desire and those who need a stated break in the wearying journey of life; a day of the gates shut down that the pond may fill. All these tastes are considered, and the State strikes a balance and says: Six days shall be free for the pursuit of labor, business and pleasure; and the quiet people must bear with the excitement and activity. One day shall be protected for the enjoyment of quiet and repose, and the active classes must submit to moderate restrictions.

To suppose that the typical American Sunday law of the present day embodies any ecclesiastical rule or any religious observance, is an entire mistake.

By way of proof and illustration, note what occurred in California. In 1858 the Legislature passed a Sunday law; and, within a very few days, a Jew who opened his clothing store on Sunday was arrested. He complained to the court. The judges all agreed that the Legislature could not pass a law to compel religious observance of Sunday; and as two of them thought this law of 1858 was meant to do this, they said it was void, and set the clothes-dealer free. Then there was practically no Sunday law for awhile. In 1861, the Legislature passed another law. A second shop-keeper was arrested and made the same complaint to the court. The judges agreed again that the Legislature could not prescribe religious observances, but they said that the new law did not profess to do so, but only sought to protect the quiet of the day from disturbance; therefore it was valid, and the shop-keeper must pay his fine. And this was not because California, even twenty years ago, was especially lax. No longer ago than 1877, a Seventh day believer prosecuted, in Massachusetts, for keeping open shop on the Lord's day, argued that he had faithfully and conscientiously kept Saturday as a Sabbath, and ought to be allowed to trade on Sunday. The judges told him that he was mistaken in supposing the law intended to make people observe a day religiously. It is a civil regulation providing for a fixed period of rest in the business, the ordinary avocations and the amusements of the community. If there is to be such a cessation from labor and amusement, some one day must be selected for the purpose; and even if the day thus selected is chosen because a great majority of the people celebrate it as a day of peculiar sanctity, the legislative authority to provide for its observance is derived from its general authority to regulate the business of the community and provide for its welfare. The law imposes on no one any religious ceremony or attendance, and any one who deems another day more suitable

for rest or worship, may observe it so ; but he may also be compelled to abstain from business on the First day ; not on religious grounds, but because he must submit to the rules which govern the business of the community. So he was condemned. And one may find similar decisions in other States.

Moreover, there is satisfactory ground for saying that the scope and purpose of these laws as administered in the courts is not confined to protecting church service from interruption, but extends to preserving the day in its entirety, as a general rest-day. The theory is not that some persons wish to attend church, but that the community has a need that the masses should have a day of quietude. There is, to be sure, an element of protecting public worship. There are equally the uses of protecting the quietude of the household; of shielding the laborer from the coercive demands of competitive business; and of interposing a barrier between the young or the unoccupied and the allurements of exciting amusements. All these and other germane objects are within the policy of these laws as practically administered.

It is noteworthy that the courts are, in their own practice, faithful to their theory of Sunday. Such a thing as a court of justice requiring any observance of Sunday, in obedience to any rule, or decision, or opinion of a judge, is wholly unknown. Such a thing as tolerating any infraction of the repose of the day by any legal proceeding except of the most necessary sort, is equally unknown. Sunday is, in the parlance of courts, *dies non juridicus ;* not a judicial day. Heinous offenders may be arrested. Beyond this the few things which may be done by a judge or court on Sunday, like allowing a jury who have sat up all Saturday night to render their verdict and go home; or a prisoner in jail to give a bail bond and be discharged, are allowed to enable people to observe the day, not to induce them to disregard it.